UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ───────────────────── x | | |
| TEAMSTERS LOCAL UNION NO. 727 | : | Civil Action No. |
| HEALTH & WELFARE FUND, Individually | : | |
| and on Behalf of All Others Similarly Situated, | : | CLASS ACTION |
| | : | |
| Plaintiff, | : | COMPLAINT FOR VIOLATIONS OF THE |
| | : | SHERMAN ANTITRUST ACT AND THE |
| vs. | : | CLAYTON ANTITRUST ACT |
| | : | |
| MYLAN, INC., TARO PHARMACEUTICAL | : | |
| INDUSTRIES LTD., TARO | : | |
| PHARMACEUTICALS USA, INC. and | : | |
| SANDOZ, INC., | : | |
| | : | |
| Defendants. | : | |
| ───────────────────── x | | DEMAND FOR JURY TRIAL |

**TO THE HONORABLE COURT**:

**NOW COMES** Plaintiff Teamsters Local Union No. 727 Health & Welfare Fund ("plaintiff"), individually and on behalf of a class of all those similarly situated, through its undersigned counsel, and respectfully brings this action for treble damages and injunctive relief against Taro Pharmaceutical Industries Ltd. ("Taro Ltd."), Taro Pharmaceuticals USA, Inc. ("Taro Inc.") (collectively, "Taro"), Mylan, Inc. ("Mylan") and Sandoz, Inc. ("Sandoz") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and the laws of the several states and territories identified herein.  Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Generic drugs are a key component of the healthcare system, accounting for approximately 88% of all prescriptions written in the United States and over $74 billion in annual sales.[1]  Importantly, entry of generics into the market is intended to increase competition and decrease prices for the benefit of consumers and their overall health – a matter made even more significant given the need for adequate and affordable healthcare.  Generic drugs are generally priced at 30%-80% less than branded drugs and are pivotal in reducing prescription costs for patients, employers and healthcare providers.  In recent years, however, the prices of certain commonly prescribed generic drugs have skyrocketed.  And normal market forces cannot explain these dizzying hikes.  Instead, manufacturers have abused their oligopolistic position, acquired through a series of acquisitions that reduced the number of market participants, to hike prices for generic pharmaceuticals far beyond what they would otherwise be in a competitive market.

2.      Generic clomipramine hydrochloride in its 25 mg, 50 mg and 75 mg oral capsule form ("Clomipramine") – a tricyclic antidepressant used for the treatment of obsessive compulsive disorder, panic disorder, major depressive disorder and chronic pain, and included on the World Health Organization's List of Essential Medicines as one of the most important medications needed

---

[1]       *See*                      http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/ UnderstandingGenericDrugs/ucm167991.htm (last accessed Dec. 14, 2016).

in a basic health system – experienced a dramatic price increase in mid-2013. Beginning in early May 2013 and continuing through early August 2013 – aligning with a February 2013 generic pharmaceutical manufacturer meeting in Orlando, Florida, attended by the defendants, and a June 2013 generic pharmaceutical manufacturer workshop in Bethesda, Maryland, sponsored by Mylan – defendants collectively and dramatically inflated their generic Clomipramine prices. Indeed, within that timeframe, average Clomipramine prices increased nearly 1,037% and have since been maintained at those supracompetitively high prices.[2] Moreover, defendants' Clomipramine price inflation was done in lockstep, with defendants coordinating their unprecedented price hikes during a short, roughly three-month period, as the inflation of their Clomipramine Wholesale Acquisition Cost ("WAC" or "list") prices illustrates:



Average Capsule Price per Unit

3.      Clomipramine was not the only drug to experience such an unexpected price hike. After years of steady pricing, beginning in 2013, prices for many generic drugs rose suddenly and for no apparent reason. A January 2014 survey of more than 1,000 members of the National Community Pharmacists Association found that 77% of the pharmacists surveyed reported "huge

---

[2]      Unless otherwise indicated: (i) sales data is based on the Actual Acquisition Cost, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers for the given products, (ii) quantity data is based on the number of units in the total prescription dispensed for the associated products, and (iii) pricing data is the calculated per-unit price for the associated products.

upswings" in generic drug prices, with prices increasing by as much as 600%, 1,000% or more.[3] These sudden and suspicious price hikes outraged not only the nation's payers and consumers, but also public officials.   In July 2014, the State of Connecticut launched an investigation into anticompetitive generic drug pricing, followed by a Congressional inquiry and a criminal grand jury investigation by the U.S. Department of Justice ("DOJ") Antitrust Division.

4.       Investigation quickly led to action.  On September 8, 2016, Taro – who, with its co-conspirators here, manufactures and sells Clomipramine – received a grand jury subpoena from the DOJ.  According to a September 2016 Taro Ltd. filing with the U.S. Securities and Exchange Commission ("SEC"), the DOJ is investigating Taro's generic drug pricing generally, and specifically seeks documents and other materials relating to "generic pharmaceutical products and pricing" and company "communications with competitors . . . regarding the sale of generic pharmaceutical products."  Defendant Sandoz who, with its co-conspirators here, manufactures and sells Clomipramine, also received a DOJ subpoena in March 2016 relating to the industry-wide investigation into generic drug pricing.  Taro's and Sandoz's primary Clomipramine competitor is their fellow defendant here, Mylan.  Representatives from each company attended the February 2013 generic manufacturer meetings, and Mylan was listed as an official sponsor of the June 2013 generic manufacturer workshop believed to have been attended by Taro and Sandoz, as well.  Taro, Sandoz and Mylan inflated the price of Clomipramine between May and August 2013.  On November 3, 2016, it was announced that the DOJ expected to file charges arising from its investigation by the end of 2016, and on December 14, 2016, the DOJ launched its first attack, bringing criminal charges in connection with the pricing of certain generic antibiotics and diabetes treatments.  The following day, on December 15, 2016, a group of twenty state attorneys general filed suit against Mylan and five other generic-drug makers, alleging the companies conspired to fix prices and constrain competition for certain antibiotics and diabetes treatments.  Further charges, brought by the DOJ or other officials, are expected in 2017.  There is no reasonable justification for defendants' abrupt and uniform shift in pricing conduct.  Indeed, as demonstrated more fully herein, defendants engaged in

---

[3]       *See Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say*, Nat. Comty. Pharmacists Ass'n (Jan. 8, 2014), http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say (last accessed Dec. 19, 2016).

a broad, well-coordinated and long-running agreement in restraint of trade to artificially raise the price of generic Clomipramine.  Accordingly, plaintiff Teamsters Local Union No. 727 Health & Welfare Fund, individually and on behalf of a class of those similarly situated, seeks injunctive relief, damages and all other appropriate relief for defendants' wrongdoing.

## JURISDICTION AND VENUE

5.     Plaintiff's claim for injuries sustained by reason of defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees.

6.     This action is also instituted under the antitrust, consumer protection and common laws of various states for damages and equitable relief, as described below.

7.     This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

8.     Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period (May 3, 2013 through the present) one or more of the defendants resided, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.  Venue is also proper in this District because acts in furtherance of the alleged conspiracy took place here, where defendant Mylan maintains regular operations.

9.     Venue is also proper because each of the defendants operates and transacts business within the District, each of the defendants has substantial contacts with this District, and each of the defendants engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing, located or doing business in this District.

## THE PARTIES

### Plaintiff

10.    Plaintiff Teamsters Local Union No. 727 Health & Welfare Fund ("Teamsters") is an employee health and welfare benefit plan with its principal place of business at 1300 W. Higgins Road, Suite 103, Park Ridge, IL 60068.  Teamsters indirectly purchased, paid and/or provided reimbursement for generic Clomipramine products, other than for resale, at supracompetitive prices in multiple states across the United States during the Class Period and was thereby injured.

### Defendants

11.    Defendant Mylan, a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania, develops, produces and markets generic pharmaceuticals, including Clomipramine, throughout the United States.  Mylan owns and operates production and office facilities in Caguas, Puerto Rico and Morgantown, West Virginia.

12.    Defendant Taro Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel.  Taro Ltd. develops, manufactures and markets prescription drugs, including generic Clomipramine, throughout the United States.  Taro Ltd. fashions itself a multinational, science-based pharmaceutical company that develops, manufactures and markets prescription and over-the-counter pharmaceutical products mainly in the United States, Canada and Israel.  The company's claimed focus includes capsules, tablets and semi-solids formulations in the neuropsychiatric, cardiovascular and anti-inflammatory therapeutic categories.  Taro Ltd. operates in the United States principally through its subsidiary defendant Taro Inc.

13.    Defendant Taro Inc. is a New York corporation with its principal place of business in Hawthorne, New York.  Taro Ltd. operates in the United States through its wholly-owned subsidiary Taro Inc., which markets and distributes Taro proprietary and generic products, including the marketing and sale of generic Clomipramine throughout the United States.

14.    Defendant Sandoz, a Colorado corporation with its principal place of business in Princeton, New Jersey, develops, produces and markets generic pharmaceuticals, including Clomipramine, throughout the United States.

15.     All acts alleged in this complaint to have been done by defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

## CO-CONSPIRATORS

16.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

17.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the other defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

18.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of Clomipramine transmitted interstate between and among the offices of defendants and their customers throughout the United States, its territories and the District of Columbia (the "United States").

19.     Throughout the Class Period, defendants transported substantial amounts of Clomipramine in a continuous and uninterrupted flow of interstate commerce throughout the United States.

20.     Throughout the Class Period, defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

### Generic Drugs in the United States

21.     Since the implementation of the Hatch-Waxman Act in 1984, generic drugs have been a critical aspect of the nation's healthcare system, saving consumers and our healthcare system tens

of billions of dollars annually and long being referred to as one of the few bargains in the U.S.
healthcare system.  Enacted to simplify the regulatory process of bringing generic drugs to the
public, the Hatch-Waxman Act eliminated the requirement that generic companies file a complex
New Drug Application ("NDA") in order to obtain U.S. Food and Drug Administration ("FDA")
approval, instead allowing drug companies to file an Abbreviated New Drug Application ("ANDA")
and rely on the safety and efficacy data provided by the original NDA holder.  Additionally, the
Hatch-Waxman Act made other changes related to the time period during which branded drugs
would enjoy a period of generic marketing exclusivity.

22.     Generic drugs are exact substitutes for brand name drugs that have met standards for
bioequivalence and pharmaceutical equivalence set by the FDA.  To be approved by the FDA
through an ANDA, a generic drug product must contain the same active ingredient(s) in the same
dosage form and in the same strength, and must be bioequivalent to the reference listed drug (*i.e.*, the
original brand name version of the drug approved by FDA through an NDA).  Under the FDA rules,
products that are classified as equivalent can be substituted with the full expectation that the
substituted product will have the same clinical effect and safety profile as the prescribed product.

23.     As an incentive to spur generic companies to provide alternatives to branded drugs,
the first generic manufacturer to file a substantially complete and certified ANDA is allowed to
market its generic drug free from competing generic manufacturers for a set period.  Often the first
generic in the market comes in at a price well below the branded drug and quickly takes a large
market share from the branded drug.  As more generics enter the market, the average generic price
typically falls to 20% or lower of the branded price.  A recent study found that generic medicines
saved consumers $193 billion in 2011 alone.  Stephen W. Schondelmeyer (BS Pharm, MA Pub
Adm, Pharm.D., Ph.D., PAPhA, Professor and Head of the Department of Pharmaceutical Care and
Health System, Century Mortar Club Endowed Chair in Pharmaceutical Management & Economics,
University of Minnesota) has explained that the prices of generics "continue to fall compared to the

brand price, and their combined share of the market for the molecule, relative to the brand name equivalent, usually continues to grow."[4]  Professor Schondelmeyer has also stated:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

24.     In his remarks to Congress in November 2014, Professor Schondelmeyer noted that price trends for generic drugs were rising, and rising at a rate far outstripping the rate of general inflation – a rate of 12.9% vs. 1.5%.  He also explained that "[t]he average annual retail price increase for brand name prescription drug products in 2013 (12.9 percent) was more than two times higher than the average annual brand name drug price increase in 2006 (5.7 percent)."

25.     The average price of Clomipramine sold by defendants saw a hike of 1,037% in just three months in 2013.  Defendants' Clomipramine WAC prices likewise uniformly rose and continue to be inflated to this day.  Defendants' 2013 WAC price hikes are illustrated below:

### Defendants' Clomipramine List Prices



---

[4]     *See Why Are Some Generic Drugs Skyrocketing in Price?*:  Hearing before the S. Comm. on Health, Education, Labor and Pensions, 113th Cong. (Nov. 20, 2014) (Statement of Stephen W. Schondelmeyer).

- 8 -

26.     The Actual Acquisition Cost of Clomipramine, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers, also strikingly demonstrates the uniformity of defendants' collusion, as illustrated below:



**Retail Pharmacies' Clomipramine Purchase Prices**

**Generic Drug Manufacture and Distribution**

27.     Unlike branded drug manufacturers who develop novel drug compounds and then must spend years conducting studies prior to receiving NDA approval from the FDA, generic drug manufacturers do not develop new drugs.  Instead, generic drug manufacturers compound drugs in a variety of forms – capsules, creams, inhalants, injectables, liquids, ointments and tablets – that are identical to an original branded drug once that drug's patent protection has expired and the generic manufacturer has received FDA approval of its ANDA.

28.     Generic drugs may be manufactured by the same companies that manufacture brand-name drugs, or may come from companies that manufacture generics exclusively.  Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce generic drugs for the U.S. market are foreign companies or are owned by foreign companies.  For example, defendant Taro Inc. is a wholly-owned subsidiary of Israeli company Taro Ltd., and defendant Sandoz is the generic drug unit of Swiss pharmaceutical giant Novartis AG.

29.     Generic drug manufacturers also manage the sale of drugs to many different drug wholesalers, distributors, retailers and group purchasing organizations.  Wholesalers and distributors purchase pharmaceuticals from the manufacturers and distribute them to customers such as pharmacies, hospitals and medical facilities.  Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation.  Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans and group purchasing organizations.  Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members.  GPOs can represent retail, governmental or healthcare groups, and some of the larger GPOs include Vizient and Premier, Inc.

30.     As the various generic drugs produced by different drug manufacturers are functionally identical, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers and GPOs is largely based on each manufacturer's price and ability to supply the drug.  The defendants in this action are all drug manufacturers and/or suppliers and as such should be competing directly with one another for the sale of Clomipramine to myriad consumers in the United States.

**Clomipramine Hydrochloride**

31.     Clomipramine – which has been available on the generic market since 1996 – is a tricyclic antidepressant used for the treatment of obsessive compulsive disorder, panic disorder, major depressive disorder and chronic pain.  Discovered by a Swiss drug manufacturer in 1964, the drug was first approved by the FDA for sale in the United States in 1989 by the company Mallinckrodt Pharmaceuticals under the trade name Anafranil.  The drug was approved for sale as a generic in 1996 and is included on the World Health Organization's List of Essential Medicines as one of the most important medications needed in a basic health system.  The market for generic drugs such as Clomipramine is mature.  Hundreds of thousands of prescriptions are filled per year for this drug.  Annual sales of the drug for 2015 were $519 million; collective sales for 2011-2014 were $1.08 billion.

- 10 -

32.     Defendants dominated the Clomipramine market.  In 2013, Mylan's Clomipramine sales exceeded $96.14 million.   Taro's Clomipramine sales for the same period exceeded $96.67 million, and Sandoz's 2013 Clomipramine sales exceeded $7.66 million.  Based on these same sales figures, defendants' Clomipramine sales make up roughly 97.9% of the clomipramine hydrochloride sales in the United States, as illustrated below:



Total 2013 Clomipramine Sales %

■ TARO PHARM USA  ■ MYLAN  ■ SANDOZ INC  ■ MALLINCKRODT PH (branded)

33.     Prior to May 2013, the average price for Clomipramine had remained stable and under a dollar per pill at approximately $0.94 per unit since at least as early as January 2011.  Then, following defendants' February 2013 meeting, the average price of Clomipramine rose abruptly to over $10.00 per pill during a three-month window:



**Defendants' Price Hikes Were Dramatic and Uniform**

34.     As illustrated above, the hike in defendants' Clomipramine prices was dramatic and uniform.  In or around late April 2013, defendants' manufacturer list prices for Clomipramine (per unit) were:

| Manufacturer | 4/26/2013 |
|---|---|
| Taro | $0.33 |
| Mylan | $0.39 |
| Sandoz | $0.35 |

35.     As the conspiracy unfolded in the few short months following their February 2013 meeting, defendants uniformly raised their Clomipramine list prices beginning in May 2013, as shown below, and by late July 2013, defendants' inflation of their Clomipramine list prices was complete and in line:

| Manufacturer | 5/3/2013 | 5/24/2013 | 7/26/2013 |
|---|---|---|---|
| Taro | $8.99 | $8.99 | $8.99 |
| Mylan | $0.40 | $8.99 | $8.99 |
| Sandoz | $0.36 | $0.37 | $8.99 |

36.     Defendants' list price inflation had a direct impact on Clomipramine's Average Wholesale Price ("AWP"), which is the price at which pharmaceuticals are purchased at the

wholesale level.  Indeed, the magnitude of defendants' price inflation is indisputable, as illustrated

by the following Clomipramine AWP for each defendant in March, August and September 2013:

| Manufacturer | 3/29/2013 | 8/30/2013 | 9/30/2013 |
|---|---|---|---|
| Taro | $0.94 | $10.58 | $10.44 |
| Mylan | $0.94 | $10.77 | $10.76 |
| Sandoz | $0.66 | $9.49 | $10.48 |

**No Commercial Justification for Price Hike**

37.     There were no reasonable justifications for this abrupt shift in pricing conduct.  One

reason prices might rise could be a supply disruption or shortage, but there was no such disruption or

shortage related to Clomipramine prior to, after or during mid-2013.  The FDA reported no

Clomipramine drug shortages, there was no new patent or formulation, no labelling changes and,

once in production, clomipramine hydrochloride is not difficult to make.  Defendants have not

provided any meaningful explanation for the coordinated price rise.  Indeed, there were no similar

price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway.

Clomipramine prices have remained consistent in those countries as illustrated below:



**Governmental Investigations into Defendants' Activities**

38.     The hike in prices of generic drugs has resulted in multiple, ongoing government

investigations, the results of which are unknown at this time.

39.     According to Taro Ltd.'s SEC Form 6-K, filed on September 9, 2016, Taro, as well as

two senior officers in its commercial team, received grand jury subpoenas from the DOJ's Antitrust

Division seeking documents relating to "corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

40.     That Taro received subpoenas from a federal grand jury seeking information about its generic prices and its "competitors" is significant, as the DOJ's Antitrust Division Manual ("DOJ Manual") cautions that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." DOJ Manual, at III-82, §F.1 (Apr. 2015). The staff request "should forward the grand jury request memorandum to the field office chief for review. If approved by the chief, the grand jury request memorandum should be emailed to the [Antitrust Criminal Enforcement Division]." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that Taro and its employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

41.     The issue of skyrocketing generic drug prices is one of national importance. In addition to the DOJ subpoenas, Congress has taken an interest in the spiraling costs of generic drugs, holding hearings and calling for an investigation. In October 2014, Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation into soaring generic drug prices.

42.     According to a press release issued by Sanders and Cummings, at that time, they wrote letters to 14 pharmaceutical companies that stated "'[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses.'" Cummings and Sanders cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting

patients'" and are having a "'very significant'" impact on pharmacists' ability to continue serving patients. The study for the National Community Pharmacists Association also found some patients refused to fill needed prescriptions because of rising prices.[5]

43.     "'It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs. We've got to get to the bottom of these enormous price increases,'" Sanders said.

44.     "'When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why,'" said Cummings. "'I am very pleased that Chairman Sanders has joined me in this bicameral investigation because in some cases these outrageous price hikes are preventing patients from getting the drugs they need.'"

45.     On December 15, 2016, twenty states filed a lawsuit under seal in a Connecticut federal court against a group of generic-drug makers, including Mylan, alleging "evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." In concise commentary on the case, an agent with the Federal Bureau of Investigation stated, "'[c]onspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law.'"[6]

**Trade Associations Facilitated Defendants' Scheme**

46.     The generic drug market is structured in a way that allows generic drug manufacturers, including defendants, to interact and communicate with each other directly and in person on a frequent basis. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by a prosecutor involved with the government's generic pricing investigation said the DOJ is looking closely "'at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople

---

[5]      Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last accessed Dec. 14, 2016).

[6]      Matthew Perrone, *Federal prosecutors accuse execs of fixing drug prices*, Assoc. Press, Dec. 15, 2016.

at different generic producers.'"  The investigative subpoena issued to Taro focuses on "communications with competitors . . . regarding the sale of generic pharmaceutical products."

47.     As these regular trade meetings were ongoing, the prices for over a thousand generic pharmaceutical drugs skyrocketed in 2013 and 2014.  According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."[7]  During this time, defendants met and interacted frequently at industry trade shows and multi-day conferences, including those hosted by the Generic Pharmaceutical Association ("GPhA"), the National Association of Chain Drug Stores, Healthcare Distribution Alliance and Efficient Collaborative Retail Marketing, among others.  At the many conferences and trade shows held by these organizations, representatives from generic drug manufacturers, including the defendants, interact with each other and discuss their respective businesses and customers and are provided with ample opportunity to discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the generic drug market.

48.     For example, defendants regularly met together at GPhA meetings in and around the Class Period.  On February 20-22, 2013, defendants met in Orlando, Florida for a multi-day GPhA conference.  Defendants met again for two days on June 4-5, 2013, in Bethesda, Maryland.  As illustrated above, pricing data demonstrates that shortly after these meetings, defendants dramatically and uniformly inflated the cost of generic Clomipramine.

## THE GENERIC CLOMIPRAMINE MARKET
## IS SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

49.     Publicly available data on the generic Clomipramine market in the United States demonstrates its susceptibility to cartelization by the defendants.  Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) inter-competitor contacts and communication.  Each of those factors is present here.

---

[7]     Gillian Mohney, *Generic Drug Price Sticker Shock Prompts Probe by Congress*, ABC News, Nov. 21, 2014.

**Market Concentration**

50.     A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  In the U.S. generic Clomipramine market, the firms that currently control the vast majority of the market are the defendants.  As discussed above, defendants' 2013 annual sales of Clomipramine – collective sales of roughly $200.49 million – for example, made up roughly 97.9% of all annual Clomipramine sales, as illustrated below:



51.     Defendants' collective dominance is also compellingly illustrated by comparing the Herfindahl-Hirschman Index ("HHI") for Clomipramine and for benzodiazepine, which is another generic drug that belongs to a different Anatomical Therapeutic Chemical classification code.  HHI is a standard measure of the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry.  An HHI score of 0 indicates perfect competition, whereas a score of 10,000 indicates a monopoly.  The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is in excess of 2,500 to be "highly concentrated."[8]  As illustrated below, the HHI for Clomipramine on average since the beginning of 2012 shows a highly concentrated market.  The benzodiazeprine index was roughly half that of Clomipramine during the same timeframe and its price movements remained relatively stable:

---

[8]     *See* https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Dec. 14, 2016).



## Barriers to Entry

52.     Supracompetitive pricing in a market normally attracts additional competitors who want to take advantage of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

53.     Here, there are significant capital requirements, high manufacturing costs and regulatory and intellectual property barriers to entry into the generic Clomipramine market. ANDAs alone, which are necessary to bring a new generic drug to market, take an average of 36 months to be approved by the FDA. This process can take even longer if the FDA requires Tier 1 and 2 amendments.

54.     In addition, defendants – a very limited number of participants – dominate the Clomipramine market, one also considered too small on a worldwide basis to entice most of the world's major pharmaceutical manufacturers to enter.

## Demand Elasticity

55.     Elasticity of demand is defined as the relationship between a change in the quantity demanded for a product or service and a change in price for the same product. More simply, it is a measure of the responsiveness of a change in price on the quantity demanded. Demand is considered inelastic if an increase in price yields only a small decrease in quantity sold.

56.     Generic Clomipramine is an important and critical drug. Hundreds of thousands of prescriptions per year are written for patients who require it. Patients consider it a necessity that must be purchased at whatever price the defendants offer it. As such, demand for Clomipramine is inelastic. Generic Clomipramine is an ideal product to fix the price of, as price increases result in

significantly more revenue with little loss in sales volume.  Defendants were able to significantly increase Clomipramine prices with minimal effect on the quantity demanded.

57.     Clomipramine, for example, has an almost perfectly inelastic demand curve, as illustrated below.  Indeed, a 1,037% increase in the price for Clomipramine results in only a 12% decrease in quantity demanded.  For Medical Care and Insurance, however, a price increase of 125% would result in no more quantity being demanded.  Highly inelastic demand facilitates defendants' cartel behavior, because defendants are able to significantly raise Clomipramine prices with minimal effect on quantity demanded, but receive a massive upside of hundreds of millions of dollars gained:



| Examples | Ed | Price % Change | Qd % Change | Elasticity |
|---|---|---|---|---|
| Clomipramine | -0.01 | 1037% | -12% | Highly inelastic |
| Medical Care and Insurance | -0.80 | 125% | -100% | Relatively inelastic |
| Public Transportation | -3.50 | 29% | -100% | Highly elastic |

**Lack of Substitutes**

58.     While there are other antidepressant drugs under the same code on the market (Act and/or their Therapeutic Characteristics ("ATC") code N06AA non-selective monoamine reuptake inhibitors) there are significant barriers to change.  Clomipramine is prescribed for a variety of specific health conditions, including obsessive compulsive disorder, panic disorder, major depressive disorder and chronic pain.  Annually, hundreds of thousands of prescriptions are written for

Clomipramine because it is unique in its potency, formulation and effectiveness.  Users of antidepressants such as Clomipramine are warned about the potential problems associated with abrupt discontinuation, including antidepressant discontinuation syndrome, a condition that can occur following the interruption, dose reduction or discontinuation of antidepressant drugs such as Clomipramine.[9]

59.    A small but significant increase in the price of Clomipramine does not cause users to switch to other drugs.  Even a large increase in price, such as occurred here, did not cause most users to switch to another drug.  For example, between January 2012 and April 2016, the quantity sold of Clomipramine and desipramine, a tricyclic drug similar in clinical effect to Clomipramine, remained consistent despite Clomipramine's significant and dramatic mid-2013 price hike:



60.    Further, Clomipramine's price hike did not extend to the other drugs in its class. From January 2012 through April 2016, the prices of amitriptyline, desipramine, doxepin, nortriptyline and imipramine, drugs that have the same ATC coding as Clomipramine and, as such, are similar in clinical effect, remained at consistent prices despite defendants' significant and dramatic mid-2013 Clomipramine price hike:

---

[9]    *See* Christopher H. Warner, *et al.*, *Antidepressant Discontinuation Syndrome*, Am. Fam. Physician, Aug. 1, 2006, at 449-456.



61.    Based on prescriptions filled nationally from January 2012 to mid-2015, Clomipramine remains the prescription of choice over these comparable drugs for doctors and consumers.  Even if there were a sea-change shift toward these comparables in prescriptions, defendants' scheme would not see any material change for a number of reasons, including that co-pay tiering changes take significant time (up to a two-year lag), consumers have little incentive to change a repeat prescription since price shock is absorbed by insurers and Medicare, and there are explicit barriers forbidding Medicare to negotiate prices.

**High Degree of Interchangeability**

62.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively.  Generic drugs are by definition interchangeable.

63.    The generic Clomipramine made by defendant is chemically identical.  The FDA requires that products be coded "AB" if a study demonstrating bioequivalence is submitted.  The FDA lists clomipramine hydrochloride as an AB-rated generic drug.  This confirms that all manufactured versions of clomipramine hydrochloride are therapeutically equivalent to each other

and pharmacists are able to substitute one manufacturer's version for another. The following chart based on FDA application records for Clomipramine demonstrates this interchangeability:

| Drug Name | Active Ingredients | Strength | Form | Therapeutic Equivalent Code | Application Number | Company |
|---|---|---|---|---|---|---|
| Anafranil | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | 019906 | Mallinckrodt LLC |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074364 | Sandoz |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074694 | Taro |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074947 | Mylan |
| Clomipramine Hydrochloride | Clomipramine Hydrochloride | 25 mg 50 mg 75 mg | Oral capsule | AB | A074958 | Teva |

**Absence of Competitive Sellers**

64.     Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for generic Clomipramine, there is no realistic threat that a fringe of competitive sellers will take market share from defendants. The defendants in the market for generic Clomipramine have oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators. And, after the dramatic price increases, the data demonstrates no defendant is willing to meaningfully undercut prices to gain market share as would be expected in a competitive marketplace.

**Contacts and Communication Opportunities**

65.     In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, the defendants are members of or participants in multiple industry trade groups, including the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and

distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[10] Thus, representatives of the defendants have the opportunity to meet and conspire at functions of this group, as well as at multiple other trade shows, conferences, customer events, dinners and meetings. The grand jury subpoena to Taro Ltd., requesting information about communications between the defendants here, lends further support to the conclusion that communications between competitors occurred with respect to the pricing of generic Clomipramine.

66.     In addition to their regular meetings at generic pharmaceutical industry events, defendants have access to and share significant and highly detailed market pricing and quantity information. This information sharing provides opportunity to share information and facilitates pricing coordination, especially in a market with limited participants. Federal DOJ and U.S. Federal Trade Commission ("FTC") antitrust guidelines acknowledge and are formed by the significance of this fact in the context of access to competitor information:

> A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. . . . Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

*       *       *

> The Agencies [*i.e.*, DOJ/FTC] regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.[11]

67.     Here, in the highly inelastic generic Clomipramine market, dominated by defendants, defendants were actively able to ensure the success of their scheme and police for any cheating, because they share and have access to one another's prices, market share, quantities sold and other material market and sales data.

---

[10]     *See* http://www.gphaonline.org/about/membership (last accessed Dec. 14, 2016).

[11]     U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* §7.2 (Aug. 19, 2010).

## DEFENDANTS' ANTITRUST VIOLATIONS

68.     During the Class Period, defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Clomipramine in the United States.

69.     In formulating and effectuating the contract, combination or conspiracy, the defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially raise, fix, maintain and/or stabilize the price of generic Clomipramine sold in the United States.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations to discuss the price of generic Clomipramine in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Clomipramine sold in the United States;

(c)     Defendants agreed during those meetings and conversations to fix the prices of generic Clomipramine; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

70.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this complaint.

71.     During and throughout the period of the conspiracy alleged in this complaint, plaintiff and members of the Class purchased generic Clomipramine at inflated and supracompetitive prices.

72.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1 and 3) and the laws of various states.

73.     As a result of defendants' unlawful conduct, plaintiff and the other members of the classes defined below have been injured in their business and property in that they have paid more for generic Clomipramine than they would have paid in a competitive market.

74.     The unlawful contract, combination or conspiracy has had the following effects, among others:

(a)     Price competition in the market for generic Clomipramine has been artificially restrained;

(b)     Prices for generic Clomipramine sold by defendants have been raised, fixed, maintained or stabilized at artificially high and non-competitive levels; and

(c)     Purchasers of generic Clomipramine have been deprived of the benefit of free and open competition in the market for generic Clomipramine.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the laws of the various states and territories detailed in Counts II, III and IV.

76.     The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons and entities in the United States and its territories, as defined herein, who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Clomipramine from May 3, 2013 through the present.  This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Clomipramine for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Clomipramine were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

77.     Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages under the antitrust, common law and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States").  This class is the Damages Class and is defined as follows:

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Clomipramine from May 3, 2013 through the present.  This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and

affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Clomipramine for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Clomipramine were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

78.     The Nationwide Class and the Damages Class are referred to collectively herein as the "Class."

79.     Due to the nature of the trade or commerce involved, plaintiff does not know the exact number of Class members involved; however, plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

80.     Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of the Class members, and plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and Class members purchased generic Clomipramine at artificially maintained supracompetitive prices established by the actions of defendants in connection with the restraint of trade alleged herein.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

81.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

82.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

83.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)     Whether defendants and their co-conspirators colluded to fix, raise, maintain and/or stabilize the price of generic Clomipramine in the United States;

(b)     Whether defendants violated §1 of the Sherman Act;

(c)     Whether defendants violated §3 of the Sherman Act;

(d)     Whether defendants violated the laws of Puerto Rico and the Indirect Purchaser States;

(e)     The duration of the conspiracy alleged in this complaint;

(f)     The nature and character of the acts performed by defendants in furtherance of the conspiracy;

(g)     Whether, and to what extent, the conduct of defendants caused injury to plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

(h)     Whether plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

84.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

## COUNT I

### For Violation of §§1 and 3 of the Sherman Act
### on Behalf of Plaintiff and the Nationwide Class

85.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

86.     During the Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, by artificially reducing or eliminating competition in the market for generic Clomipramine and engaging in a conspiracy to artificially fix, raise, maintain and/or stabilize the prices for generic Clomipramine in the United States.

87.     In particular, defendants have agreed, combined and conspired to raise, fix, maintain or stabilize the prices of generic Clomipramine in the United States.

88.     In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially fix, raise, maintain and/or stabilize the prices of generic Clomipramine in the United States.

89.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

90.     Defendants' conspiracy had the effect of artificially inflating the price of generic Clomipramine in the United States.

91.     As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Nationwide Class paid more for generic Clomipramine than they otherwise would have paid in the absence of defendants' unlawful conduct.

92.     By reason of defendants' unlawful conduct, plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic Clomipramine.

93.     As a direct and proximate result of defendants' conduct, plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

94.     These agreements constitute trade restraints made between direct competitors that are unlawful under all three applicable standards of review:  (1) the *per se* standard, which governs bid-rigging and the allocation of markets by horizontal agreement; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade. Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the "quick-look" standard and the Rule of Reason.

95.     Plaintiff and members of the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of Puerto Rico's and State Antitrust Statutes
### on Behalf of Plaintiff and the Damages Class

96.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

97.     During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Clomipramine in unreasonable restraint of trade and commerce and in violation of Puerto Rico's and the various other state antitrust and other statutes set forth below.

98.     The contract, combination or conspiracy consisted of an agreement among defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for generic Clomipramine and to allocate customers for generic Clomipramine in Puerto Rico and the rest of the United States.

99.     In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Clomipramine at certain levels, and otherwise to fix, increase, inflate, maintain or stabilize effective prices paid by plaintiff and members of the Damages Class with respect to generic Clomipramine provided in Puerto Rico and the rest of the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to and police the unlawful agreements they reached.

100.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain or stabilize prices of generic Clomipramine.

101.     As alleged in this complaint, defendants and their co-conspirators: entered into an unlawful agreement in restraint of trade; entered into and engaged in a continuing unlawful trust and concert of action in restraint of trade and commerce; and fixed, raised, stabilized and maintained prices of generic Clomipramine at supracompetitive levels.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Clomipramine has been restrained, suppressed and/or eliminated; (2) prices for generic Clomipramine provided by

- 29 -

defendants and their co-conspirators have been fixed, raised, stabilized and pegged at artificially high, noncompetitive levels; and (3) those who purchased generic Clomipramine directly or indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic Clomipramine than they otherwise would have paid in the absence of defendants' unlawful conduct.  As a result of defendants' violations of law, plaintiff and members of the Damages Class seek treble damages and their cost of suit, including reasonable attorneys' fees. Defendants' anticompetitive acts described herein were knowing and willful and constitute flagrant violations of the antitrust statutes of Puerto Rico and the following states:

(a)     Puerto Rico: The aforementioned practices by defendants were and are in violation of the Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA §257, *et seq*.;

(b)     Alabama: The aforementioned practices by defendants were and are in violation of the Alabama Code §6-5-60, *et seq.*

(c)     Arizona: The aforementioned practices by defendants were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §44-1401, *et seq*., and the Constitution of the State of Arizona, Article 14, §15;

(d)     California: The aforementioned practices by defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*.;

(e)     District of Columbia: The aforementioned practices by defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, *et seq*.;

(f)     Illinois: The aforementioned practices by defendants were and are in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq*.;

(g)     Iowa: The aforementioned practices by defendants were and are in violation of the Iowa Competition Law, Iowa Code §553.1, *et seq*.;

(h)     Kansas: The aforementioned practices by defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §50-101, *et seq*.;

(i) Maine: The aforementioned practices by defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §1101, *et seq.*;

(j) Michigan: The aforementioned practices by defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §445.771, *et seq.*;

(k) Minnesota: The aforementioned practices by defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §325D.49, *et seq.*;

(l) Mississippi: The aforementioned practices by defendants were and are in violation of Miss. Code Ann. §75-21-1, *et seq.*;

(m) Nebraska: The aforementioned practices by defendants were and are in violation of Ne. Rev. Stat. §59-801, *et seq.*;

(n) Nevada: The aforementioned practices by defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §598A.010, *et seq.*;

(o) New Mexico: The aforementioned practices by defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, *et seq.*;

(p) New York: The aforementioned practices by defendants were and are in violation of N.Y. Gen. Bus. Law §340, *et seq.*;

(q) North Carolina: The aforementioned practices by defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §75-1, *et seq.*;

(r) North Dakota: The aforementioned practices by defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §51-08.1-01, *et seq.*;

(s) Oregon: The aforementioned practices by defendants were and are in violation of Oregon Rev. Stat. §646.725, *et seq.*;

(t) Rhode Island: The aforementioned practices by defendants were and are in violation of Rhode Island General Laws §6-36-1, *et seq.*;

(u) South Dakota: The aforementioned practices by defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §37-1-3.1, *et seq.*;

(v) Tennessee: The aforementioned practices by defendants were and are in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101, *et seq.*;

(w)     Utah: The aforementioned practices by defendants were and are in violation of Utah Code §76-10-911, *et seq*.;

(x)     Vermont: The aforementioned practices by defendants were and are in violation of  Vt. Stat. Ann. tit. 9, §2451, *et seq*.;

(y)     West Virginia: The aforementioned practices by defendants were and are in violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1; and

(z)     Wisconsin: The aforementioned practices by defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §133.01, *et seq*.

102.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for generic Clomipramine than they otherwise would have paid in the absence of defendants' unlawful conduct. This injury is of the type the antitrust laws of Puerto Rico and the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

103.    In addition, defendants have profited significantly from the conspiracy.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiff and the members of the Damages Class.

104.    Accordingly, plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT III

### Violation of Puerto Rico's and State Consumer Protection Statutes
### on Behalf of Plaintiff and the Damages Class

105.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

106.   As described herein, defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine was sold, distributed or obtained and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Clomipramine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes deceptive acts or practices within the meaning of Puerto Rico's and the following state laws, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed and eliminated; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine.  During the Class Period, defendants marketed, sold, or distributed generic Clomipramine in Puerto Rico and the rest of the United States, and defendants' illegal conduct substantially affected commerce and consumers in Puerto Rico and the rest of the United States.

107.   During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic

- 33 -

Clomipramine in Puerto Rico and the rest of the United States.  Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the laws of Puerto Rico and various state laws and, accordingly, plaintiff and members of the Damages Class seek all relief available under the following statutes:

(a)    Puerto Rico: The aforementioned practices by the defendants were and are in violation of the Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA §257, *et seq.*;

(b)    Arizona: The aforementioned practices by the defendants were and are in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §44-1521, *et seq.*;

(c)    Arkansas: The aforementioned practices by the defendants were and are in violation of Arkansas Code §4-88-101, *et seq.*;

(d)    California: The aforementioned practices by the defendants were and are in violation of the California Unfair Competition Act, Cal. Bus. & Prof. Code §17200, *et seq.*;

(e)    District of Columbia: The aforementioned practices by the defendants were and are in violation of D.C. Code §28-3901, *et seq.*;

(f)    Florida: The aforementioned practices by the defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201, *et seq.*;

(g)    Hawaii: The aforementioned practices by the defendants were and are in violation of Hawaii Revised Statutes §480-1, *et seq.*;

(h)    Idaho: The aforementioned practices by the defendants were and are in violation of Idaho Code §48-601, *et seq.*;

(i)    Illinois: The aforementioned practices by the defendants were and are in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*;

(j)    Kansas: The aforementioned practices by the defendants were and are in violation of Kan. Stat. Ann. §50-623, *et seq.*;

(k)    Massachusetts: The aforementioned practices by the defendants were and are in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch 93A, §1, *et seq.*;

(l)     Michigan: The aforementioned practices by the defendants were and are in violation of the Michigan Consumer Protection Act, §445.901, *et seq*.;

(m)     Minnesota: The aforementioned practices by the defendants were and are in violation of the Minnesota Consumer Fraud Act, Minn. Stat §325F.68, *et seq*.;

(n)     Missouri: The aforementioned practices by the defendants were and are in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.025;

(o)     Nebraska: The aforementioned practices by the defendants were and are in violation of Ne. Rev. Stat. §59-1601, *et seq*.;

(p)     Nevada: The aforementioned practices by the defendants were and are in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, *et seq*.;

(q)     New Mexico: The aforementioned practices by the defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, *et seq*., and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §57-12-1, *et seq*.;

(r)     New York: The aforementioned practices by the defendants were and are in violation of the New York Deceptive Act and Practices Act, N.Y. Gen. Bus. Law §349, *et seq.*;

(s)     North Carolina: The aforementioned practices by the defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §75-1.1, *et seq*.;

(t)     Pennsylvania: The aforementioned practices by the defendants were and are in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §201-1, *et seq*.;

(u)     Rhode Island: The aforementioned practices by the defendants were and are in violation of R.I. Gen. Laws §6-13.1-1, *et seq*.;

(v)     Vermont: The aforementioned practices by the defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §2451, *et seq*.; and

(w)     Wisconsin: The aforementioned practices by the defendants were and are in violation of Wisconsin's unfair competition statute, Wis. Stat. §100.20, *et seq*.

**COUNT IV**

**Unjust Enrichment**
**on Behalf of Plaintiff and the Damages Class**

108.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

109.    As a result of their unlawful conduct described above, defendants have been, and will continue to be, unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, generic Clomipramine.

110.    Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from the overpayments made by plaintiff and the members of the Damages Class for generic Clomipramine manufactured by defendants during the Class Period.

111.    Plaintiff and the members of the Damages Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which plaintiff and the members of the Damages Class may make claims on a pro rata basis.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff requests that the Court enter judgment on plaintiff's behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have engaged in a combination and conspiracy in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, and plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violation;

C.    Plaintiff and the members of the Class are entitled to recover damages sustained by them, as provided by the state antitrust laws listed in Count II and the consumer protection laws listed in Count III, an injunction under federal antitrust laws and that a joint and several judgment in favor of plaintiff and the Class be entered against defendants in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, this 26th day of January, 2017.

THE LAW OFFICES OF ANDRÉS W. LÓPEZ, P.S.C.
ANDRÉS W. LÓPEZ (USDC NO. 215311)


            s/ Andrés W. López
          ANDRÉS W. LÓPEZ

P.O. Box 13909
San Juan, PR  00908
Telephone:  787/294-9508
787/294-9519 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

BOIES, SCHILLER & FLEXNER LLP
DAMIEN J. MARSHALL
DUANE L. LOFT
MATTHEW S. TRIPOLITSIOTIS
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: 212/446-2300
212/446-2350 (fax)

Attorneys for Plaintiff